# Apportionment of False Claims Act Recoveries to Agencies

Whether an agency's revolving fund is entitled to receive from a False Claims Act recovery (in addition to single damages equal to the actual amount of the payment made as a result of the false claim) pre-judgment or pre-settlement interest on that payment and investigative and administrative costs attributable to the false claim depends on whether the fund is authorized to borrow money at interest, earn interest on its own investments, and pay its own investigative and administrative expenses.

March 12, 2004

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF PERSONNEL MANAGEMENT
AND THE GENERAL COUNSEL
U.S. POSTAL SERVICE

This memorandum addresses what portions, beyond single damages, of a monetary settlement or judgment awarded the United States under the False Claims Act ("FCA") can be received by the agency that paid the false claim from a revolving fund.[1] Our opinion responds to separate requests submitted to this Office for our opinion concerning (1) whether the Employees Health Benefits Fund ("OPM Fund") administered by the Office of Personnel Management ("OPM") may receive a portion of an FCA recovery representing lost interest,[2] and (2) whether the Postal Service Fund administered by the U.S. Postal Service ("Postal Service") may receive the entirety of such a recovery.[3] Both opinion requests concern false claims resulting in payments from revolving funds operated by the agencies in question.

As discussed below, we conclude that whether a revolving fund is entitled to receive (in addition to single damages equal to the actual amount of the payment made as a result of the false claim) pre-judgment or pre-settlement interest on that payment and investigative and administrative costs attributable to the false claim depends on whether the fund is authorized to borrow money at interest, earn

---

[1] This opinion is limited to the revolving fund context and does not address the distribution of FCA recoveries where the false claim was paid from agency appropriations. In preparing this opinion, this Office has consulted with the Civil Division, which litigates False Claims Act cases involving false claims submitted to agencies of the government. The Civil Division has not submitted written views, but has reviewed this opinion and concurs in its conclusions and analysis.

[2] See Letter for Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, from Janice R. Lachance, Director, U.S. Office of Personnel Management (Jan. 18, 2001).

[3] See Memorandum for Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, from Robert D. McCallum, Jr., Assistant Attorney General, Civil Division, *forwarding* Letter for Stephen D. Altman, Assistant Director, Civil Fraud, Civil Division, from Eric Scharf, Managing Counsel, Civil Practice Section, U.S. Postal Service (Feb. 7, 2002).

interest on its own investments, and pay its own investigative and administrative expenses. Because the Postal Service Fund is authorized to borrow money at interest, to earn interest on its investments, and to pay investigative and other administrative expenses from the fund, it is entitled to receive from the FCA recovery pre-judgment or pre-settlement interest it paid or interest it failed to earn as a result of the false claim, as well as investigative and administrative costs attributable to the false claim. This conclusion also applies to the OPM Fund, except that because the OPM Fund is not authorized to borrow funds, OPM may receive amounts allocable to interest only to the extent that the Fund was earning interest at the time the false claim was paid and so long as it continues to earn interest. Neither agency may receive any portion of an FCA recovery that does not reflect actual loss to its Fund but instead represents multiple damages or penalties.

## I.

Under the False Claims Act, a person who submits a false claim "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person," except that only double damages are assessed if certain conditions set forth in the statute are met. 31 U.S.C. § 3729(a) (2000). The Civil Division's practice has been to allocate only single damages to the agencies. OPM and the Postal Service believe they are entitled to a greater share of FCA recoveries.

OPM argues that it is entitled to receive not just single damages but also interest on that amount representing either the interest not earned by the OPM Fund because of the payment made on the false claim or the interest to be paid by the OPM Fund if it was operating under a deficit and had to borrow from the Treasury in order to make the payment. OPM acknowledges that money received by the government must generally be deposited in the Treasury pursuant to the Miscellaneous Receipts Act ("MRA"), 31 U.S.C. § 3302 (2000), but argues that single damages and interest may be credited to the OPM Fund based on the "refund to appropriations" exception to the MRA requirement. The Postal Service makes the same argument, but in addition argues that the Postal Service Fund should also recover its investigative and administrative costs.[4]

---

[4] The Postal Service also argues, more broadly, that the Fund should receive the entirety of the FCA recovery because the Postal Service is exempt from the MRA, and even if it is not exempt, the Service has been specifically authorized by statute to collect penalties and therefore the Fund should receive the rest of an FCA recovery beyond single damages because those multiple damages constitute penalties. We do not believe that those arguments are available to the Postal Service in the FCA context because the recovery in a FCA suit is payable to the United States, 31 U.S.C. § 3729(a) ("Any person who [submits a false claim] is liable to the United States Government"), not to individual agencies. Thus, it is beside the point that the Postal Service itself might be exempt from the MRA or might be authorized itself to collect penalties. The question presented by this opinion is limited to whether and to what ex-

Under the MRA, "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). The Executive Branch and the Comptroller General have construed the MRA to provide an exception for "refunds to appropriations." Treasury Department–General Accounting Office Joint Regulation No. 1, § 2(b) (Sept. 22, 1950) ("Treasury Department–GAO Joint Regulation"), *reprinted in* 30 Comp. Gen. 595 (defining, as one of two classes of "repayments to appropriations," "[r]efunds to appropriations which represent amounts collected from outside sources for payments made in error, overpayments, or adjustments for previous amounts disbursed, including returns of authorized advances"). "The term 'refund,'" in GAO practice, "embraces a category of mostly nonstatutory exceptions in which the receipt is directly related to, and is a direct reduction of, a previously recorded expenditure." 2 General Accounting Office, *Principles of Federal Appropriations Law* 6-109 (2d ed. 1992) ("*Federal Appropriations Law*").[5]

We agree with the Comptroller General's opinion in *Matter of Federal Emergency Management Agency*, 69 Comp. Gen. 260 (1990) ("*FEMA*"), that, in the context of false claims paid out of a revolving fund operated by FEMA, the "collections for overpayments made" prong of the refund exception allows the agency to retain single damages.[6] *Id.* at 262. The Comptroller General also explained in *FEMA* that because the FEMA revolving fund earns interest on its investments, 12 U.S.C. § 1749bbb-13(b)(2) (2000), and may borrow money at interest from the Treasury, *id.* § 1749bbb-13(a)(3), a false claim results in "additional interest expense or reduced interest income." 69 Comp. Gen. at 262.

---

tent the "refund to appropriations" exception to the MRA is available to authorize the Civil Division, on behalf of the United States, to distribute FCA recoveries to agency accounts within the Treasury instead of the general fund of the Treasury. We express no opinion on the availability of these arguments to the Postal Service in any context other than the FCA context.

[5] We assume *arguendo* throughout this memorandum the correctness of the Comptroller General's longstanding construction of the MRA, a construction that the Executive Branch has shared or at least acquiesced in. Two aspects of that construction are pertinent here. First, the MRA's requirement that money be deposited "in the Treasury" has been understood to require a deposit in the *general fund* of the Treasury. 2 *Federal Appropriations Law* at 6-106. Second, the MRA's mandate has been understood to be subject to a non-textual exception for "refunds to appropriations." *Id.* at 6-109. A possible alternative interpretation of the MRA, however, would be that the MRA requires only what its text states—that miscellaneous receipts must go to the Treasury, but not to any particular fund or account in the Treasury. Under this interpretation, decisions about where miscellaneous receipts are directed in the Treasury would be guided by the anti-augmentation principle (an agency may not augment its appropriations from outside sources without statutory authority) that GAO finds embedded in the MRA and other statutes, *see id.* at 6-103, but it would be understood that the principle is derived from the Constitution, not the MRA. You have not asked us to reconsider the longstanding construction of the MRA, and we express no opinion on it here.

[6] As we have repeatedly stated, the opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues, but are not binding upon departments, agencies, or officers of the Executive Branch.

We agree with the Comptroller General that this lost interest income is "a direct consequence of the false claims [the agency] paid and [increases] the magnitude of the losses the Fund suffered as a result of paying those claims." *Id.* at 262–63.

## II.

We also agree with the Comptroller General that the agency should be reimbursed for "[a]ny administrative expenses that [the agency] charged the Fund in connection with making or recovering these erroneous payments." *Id.* at 263. Not only are the administrative costs incurred in the processing of the false claim in the first instance clearly reimbursable, but in addition the agency's recovery of the "administrative expenses in the course of investigating the validity of the false insurance claims submitted and in assisting in the preparation of this case for trial, all of which were paid from the Fund," *id.*; 12 U.S.C. § 1749bbb-13(a)(2), would make the agency "whole at no additional expense to the taxpayer," 69 Comp. Gen. at 263 (quoting *Matter of Bureau of Prisons*, 62 Comp. Gen. 678, 682 (1983)) (internal quotation marks omitted). Thus, allowing the agency to retain interest on single damages and the administrative costs of false claims would not be an improper augmentation of the agency's appropriation and is consistent with the Treasury Department–GAO Joint Regulation.

The OPM and Postal Service Funds are both revolving funds. 5 U.S.C. § 8909(a) (2000) (authorizing payments both into and out of the OPM Fund with no fiscal year limitation); 39 U.S.C. §§ 2003(a)–(b) (2000) (same for Postal Service Fund). The OPM Fund is authorized to invest its money in interest-bearing obligations, the interest on which becomes part of the Fund. 5 U.S.C. § 8909(c). The OPM Fund is not authorized to borrow money at interest, but as long as the Fund is not in deficit during the period between the payment and the recovery of a false claim, the false claim results in lost interest income. The OPM Fund pays for administrative expenses "within the limitations that may be specified annually by Congress," *id.* § 8909(a)(2), and in fact a portion of employee contributions is specifically set aside for such administrative expenses, *id.* § 8909(b)(1). The Postal Service Fund is also authorized to collect interest on its investments, 39 U.S.C. § 2003(b)(4), and may borrow money, *id.* § 2005(a) (2000), at interest, *id.* § 2005(c)(5), and "investigate postal offenses and civil matters relating to the Postal Service," *id.* § 404(a)(7) (2000). Therefore, under the reasoning of the *FEMA* opinion, and consistent with the Treasury Department-GAO Joint Regulation, the OPM Fund and the Postal Service Fund may recover both interest income lost and administrative expenses incurred as a result of a false claim, and the Postal Service Fund may also recover interest paid as a result of the false claim.

### III.

Finally, we agree with the Comptroller General's conclusion in *FEMA* that the agency could not receive any portion of the FCA recovery that represented an amount beyond actual losses to the agency, such as multiple damages or penalties. That amount would have to be remitted to the Treasury for deposit into the general fund. 69 Comp. Gen. at 264. We likewise conclude that neither the OPM Fund nor the Postal Service Fund may receive any amount of a FCA recovery that does not reflect actual loss to the fund but instead can only be viewed as multiple damages or a penalty.

M. EDWARD WHELAN III
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
